APPLICATION OF EDWIN B. FORSYTHE, MATTHEW J. RINAL-
DO, MILLICENT FENWICK, HAROLD C. HOLLENBECK,
JAMES A. COURTER, MARGARET S. ROUKEMA, AND CHRIS-
TOPHER H. SMITH.

Superior Court of New Jersey
Appellate Division

Argued April 27, 1982—Decided April 30, 1982.

Before Judges MATTHEWS, PRESSLER and PETRELLA.

*Jonathan L. Goldstein* argued the cause for petitioners (*Hellring, Lindeman, Goldstein & Siegel,* attorneys; *Bernard Hellring, Robert A. Raymar, Stephen L. Dreyfuss* and *Jonathan L. Goldstein,* of counsel and on the brief).

*William Harla,* Deputy Attorney General, argued the cause for the State of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The majority opinion of the court was delivered by

MATTHEWS, P. J. A. D.

These proceedings were instituted by seven citizens of the State who are all presently members of the House of Representatives, questioning the constitutionality of the enactment procedure employed by the Legislature in the passage of chapter 1 of the *Laws of* 1982. The petition is filed under the provisions of *N.J.S.A.* 1:7–4 which gives this court jurisdiction in the premises in the first instance. The petition broadly alleges that the law in question is void on the ground that it was not passed by both houses of the Legislature in the manner required by Art. IV, § IV, ¶ 6 of the State Constitution:

All bills and joint resolutions shall be read three times in each house before final passage. No bill or joint resolution shall be read a third time in either house until after the intervention of one full calendar day following the day of the second reading; but if either house shall resolve by vote of three-fourths of all its members, signified by yeas and nays entered on the journal, that a bill or joint resolution is an emergency measure, it may proceed forthwith from second to third reading....

The uncontroverted facts, drawn largely from the petition, disclose that as the result of the 1980 decennial census it became necessary for the New Jersey Legislature to divide the State into new congressional districts on the basis of that census and in accordance with the procedures established by the Constitution and laws of this State. That obligation became incumbent upon the Legislature after notification was given to the Governor that the number of representatives to which this State is

entitled has been decreased from 15 to 14. See 2 *U.S.C.A.* § 2a(b).

Thereafter, on January 12, 1982 a congressional redistricting bill, denominated S–711, was introduced in the New Jersey Senate. That bill was advanced to second reading in the Senate on the same date, and on January 18, 1982 was given third reading and thereupon passed by the Senate. The bill as passed was, on January 18, 1982, delivered to the General Assembly.

A congressional redistricting bill, numbered A–605, was introduced in the General Assembly on January 12, 1982 and given first reading there on that date. The bill was given second reading on the evening of January 12, 1982. A–605 was identical in its provisions to those contained in S–711.[1]

On January 18, 1982 S–711 was received in the General Assembly from the Senate with a request that the Assembly concur therein. S–711 was given a first reading in the Assembly upon its receipt on January 18, 1982 and, on the same date, by motion, was advanced to second reading by special order on a vote of 41 in favor and 34 against. Thereafter, still on January 18, 1982, S–711 was substituted for A–605 in the General Assembly by motion without roll call vote.

S–711 was thereupon immediately given a third reading in the Assembly and passed on January 18, 1982 by a vote of 42 in favor and 34 against.

The bill was thereupon delivered to the Governor who signed it into law.

The substitution of S–711 for A–605 in the General Assembly on January 18, 1982 was made under the provisions of *Rule* 15:20 of *The Rules of the General Assembly:*

> When a bill originating in the Senate shall have been delivered to this House, with a message that the Senate has passed the same and requesting the

---

[1] In using the word "identical" we refer to the substantive provisions of the bills commencing with the title and enactment clauses. See *Rule* 15:20 of *The Rules of the General Assembly,* quoted *infra.*

concurrence of this House therein, and a bill identical therewith, originating in this House, is then pending in this House, the Senate Bill may be substituted for such Assembly Bill, on motion of a sponsor of such Assembly Bill, upon or after the second reading of the Assembly Bill and the Senate Bill may then be advanced to, and have, third reading and be passed in substitution for the Assembly Bill and take the usual course of passed bills and the sponsors of the Assembly Bill may, upon the motion of one of them, be added as co-sponsors of the Senate Bill, with the Senator or Senators who were sponsors of the Senate Bill in the Senate and the names of such co-sponsors shall be endorsed upon the jacket containing the Senate Bill. The provisions of this Rule are expressly subject to the provisions of Rule 15:12. No Senate bill may be substituted for an Assembly bill unless the Senate bill shall have received second reading in the General Assembly.

It is the petitioners' contention that since the proponents of S–711 knew that they had been able to muster only 41 votes in favor of the motion to advance S–711 to second reading in the Assembly by special order, they also knew there was no way in which 60 affirmative votes, which would have been necessary to hold that S–711 was an emergency measure under the afore-mentioned constitutional provision, could be obtained. Petitioners contend that the Assembly majority was thus presented with a direct conflict between political expediency and compliance with the mandate of the Constitution. The inauguration of the incoming Governor was to take place on January 19, 1982, and if the Assembly was to comply with the Constitution, it could not pass S–711 before January 20, 1982, and therefore would be required to submit it to the new Governor, who probably would veto it. Petitioners allege that the only way that the outgoing Governor could receive S–711 to be signed into law was for the Assembly simply to disregard the constitutional mandate and move S–711 to third reading and passage the same day as its receipt from the Senate.

The gist of petitioners' argument is that the substitution of S–711 for A–605 was constitutionally impermissible. They argue that S–711 could not have been acted on by the Assembly in any way without the intervention of one calendar day.

In exercising our jurisdiction under the statute establishing the procedure here involved, *N.J.S.A.* 1:7–1 *et seq.*, we

emphasize at the outset that our jurisdiction extends only to resolving the question of whether chapter 1 of the *Laws of* 1982 was adopted by a procedure in conformity with the constitutional requirement set out in Art. IV, § IV, ¶ 6 of our Constitution. We do not claim to assert, nor could we assert, jurisdiction over the internal procedures of the General Assembly or the rules of that body which are adopted in accordance with the provisions of Art. IV, § IV, ¶ 3 of the Constitution. *Compare Gilbert v. Gladden,* 87 *N.J.* 275 (1981). Our sole quest is to determine whether the statute in arriving in its status as a law reached there by a route condoned by the Constitution.

In his comments on the New Jersey Constitution of 1947, Judge Milmed,[2] referring specifically to the provisions of Art. IV, § IV, ¶ 6, stated:

> To "effectively cure the evil of rushing bills from second to third reading without giving the members of the Legislature an opportunity to study their contents", the Convention's Committee on the Legislative recommended, and the Convention adopted, a new provision (Article IV, Section IV, Paragraph 6) which has contributed immeasurably to the more orderly conduct of the legislative process. This provision prohibits any bill or joint resolution from being read a third time in either house until after the intervention of one full calendar day following the day of the second reading. The Committee on the Legislative recognized "that the inclusion of this provision might make it difficult, or even impossible, for the Legislature to deal with real emergencies, which might require immediate action". To guard against such a contingency the Committee proposed, and the Convention adopted an exception to the one day lay-over clause which permits a bill or joint resolution to proceed forthwith from second to third reading in either house if that house resolves by vote of three-fourths of all its members, signified by yeas and nays entered on the journal, that it is an emergency measure.
>
> In proposing the provision requiring a full day's intervention between second and third reading of a bill or joint resolution, the Convention's Committee on the Legislative expressed "confident expectation" that the provision "will not only bring about more orderly sessions of the Legislature but will also improve the character of legislation by affording an adequate opportunity to the members to become acquainted with bills which they know will be moved to third reading."

---

[2]"The New Jersey Constitution of 1947," *N.J.S.A., Const.,* at 91, 97. Judge Milmed was a legal advisor to the 1947 Constitutional Convention, and also personal counsel to Governor Alfred E. Driscoll.

We have no doubt that the constitutional provision here involved was adopted by the framers to insure that legislation would be studied, or at least read, by legislators before it went to third reading and adoption by a house. We do not understand the comment just quoted or, more importantly, the wording of the constitutional provision itself, to demand that any particular rite be followed in the adoption of legislation as long as the content of a bill remains unchanged before a house of the Legislature for one calendar day before third reading and passage. We believe that that is what occurred here.

As noted at the beginning of this opinion, the contents of both S–711 and A–605 are identical, excepting, of course, the number at the top of the bill and the name of the sponsor which are not part of the enactment but are part of the rite.[3] As a matter of common sense, it is apparent that the content of the bill that would eventually become chapter 1 of the *Laws of* 1982 was before each house of the Legislature for at least six calendar days before final passage by each house. Such being the case, the inescapable conclusion is that the constitutional condition has been obeyed.

We do not regard a bill as being a piece of paper with a number at the top and a name of a sponsor at its head, or a particular color on its backer. A bill in the legislative sense consists of its content—the words which are to be adopted by the Legislature that ultimately will become law. The number, the name and the color are mere accidents—mere tangible affects adopted for the purpose of easy identification. A bill, on the other hand, represents the effort of both houses of the Legislature to adopt a law. Regardless of where a bill is introduced, it must pass both houses of the Legislature in

---

[3]The dissent posits questions as to variations in bills which *might* possibly pass both houses under the procedures questioned here. We deem it totally unnecessary to deal with such "hypothetical horribles" since they do not exist in this case.

identical form before it may be entertained by the Governor for signature. Indeed, every bill in whichever house introduced, if it is to become a law of this State, must begin with the injunction: "Be it enacted by the Senate and General Assembly of the State of New Jersey." See Art. IV, § VII, ¶ 6 of our Constitution.

We see nothing in our Constitution that prohibits identical bills from proceeding through both houses of the Legislature.[4] It seems to be a matter of common sense that the house whose bill has not yet been passed should defer to the other house which has passed the identical bill in entertaining the bill which is to become law. As we have noted, the constitutional mandate under Art. IV, § IV, ¶ 6, exists to insure that there be knowledge, at least on the part of the individual legislators, of the content of any bill before it advances to third reading and passage. That is precisely what occurred here. The legislative procedure employed to reach that result is beyond our jurisdiction. We are satisfied, however, that the bill ultimately adopted by the Legislature and submitted to the Governor had its provisions before both houses of the Legislature for a period in excess of the one calendar day required in the Constitution.

In view of the conclusions we have reached as stated in this opinion, the application of petitioners is dismissed.

PETRELLA, J. A. D. (dissenting).

The New Jersey Constitution provides the method of adopting legislation in this State. See *N.J.Const.* (1947), Art. IV, § IV, par. 6 and Art. V, § I, par. 14. Even the importance of mandated congressional redistricting cannot excuse a failure to follow the organic law of this State embodied in our Constitution as adopted by the people. Notwithstanding contrary assertions by the majority, it is important within the context of the above-cited constitutional provisions to distinguish and desig-

---

[4]Contrary to the import of the dissent, S–711 and A–605 were identical bills.

nate in some manner bills introduced in either the General Assembly or the State Senate. Of course, the title to each bill is constitutionally mandated and limited to one object. *N.J.Const.* (1947), Art. IV, § VII, par. 4. In addition, the constitutional requirements for the enacting of laws and for the Governor's exercise of veto powers mandate such a procedure. In furtherance of the constitutional scheme there has traditionally been established under rules of the Legislature a strict system of accountability for bills with separate color-coded backers and a system of signature endorsements for sponsorship and referrals of bills or delivery of bills. In part, the statutory framework which fleshes out the constitutional provisions as well as the rules of both houses of the Legislature serve the necessary purpose of insuring permanent safeguarding of the statute laws of this State. *See Gilbert v. Gladden,* 87 *N.J.* 275, 287 (1981).

I must dissent from the holding of the majority because my reading of the requirements of the New Jersey Constitution differs as it applies to the procedure utilized here. What is clear is that the bill signed by former Governor Brendan T. Byrne on January 19, 1982, the last day of his term in office, was Senate Bill 711 (S–711). That bill was enacted in a method that not only did not comport with the mandates of our State Constitution, but in a fashion that even violated the rules of the General Assembly. It was thus rendered subject to challenge either by the Attorney General or by at least two citizens of this State under either *N.J.S.A.* 1:7–1 or 1:7–4. The challenge here under the statute is based solely on the mechanics of the enactment and is not addressed to the merits of the law or to the constitutionality of any substantive provision. *See In re McCabe Application,* 81 *N.J.* 462, 467 (1980). Hence, although each house of the Legislature determines its own rules as authorized by Art. IV, § IV, par. 3 of our Constitution, the legislation it enacts must comply with the constitutional mandate. While I would agree that either house of the Legislature may suspend its rules

by vote,[1] it is an entirely different matter when there is a failure to comply with an express constitutional requirement. I would hold that the undisputed facts here clearly render *L.* 1982, *c.* 1, subject to invalidation despite any presumption in favor of enactment of legislation consistent with procedures authorized by the Constitution. *See In re Ross,* 86 *N.J.L.* 387, 391 (Sup.Ct. 1914).

### *N.J.Const.* (1947), Art. IV, § IV, par. 6, reads:

Bills and joint resolutions; reading and passage; emergency measures; voting on final passage

All bills and joint resolutions shall be read three times *in each house* before final passage. No bill or joint resolution shall be read a third time in either house until after the intervention of one full calendar day following the day of the second reading; but if either house shall resolve by vote of three-fourths of all its members, signified by yeas and nays entered on the journal, that a bill or joint resolution is an emergency measure, it may proceed forthwith from second to third reading. No bill or joint resolution shall pass, unless there shall be a majority of all the members of each body personally present and agreeing thereto, and the yeas and nays of the members voting on such final passage shall be entered on the journal. [Emphasis added].

### Art. V, § I, par. 14(a) reads:

Every bill which shall have passed both houses shall be presented to the Governor. If he approves he shall sign it, but if not he shall return it, with his objections, to the house in which it shall have originated, which shall enter the objections at large on its journal and proceed to reconsider it. If upon reconsideration, on or after the third day following the return of the bill, two-thirds of all the members of the house of origin shall agree to pass the bill, it shall be sent, together with the objections of the Governor, to the other house, by which it shall be reconsidered and if approved by two-thirds of all the members of that house, it shall become a law; and in all such cases the votes of each house shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively. If a bill shall not be returned by the Governor within 10 days, Sundays excepted, after it shall have been presented to him, the same shall become a law on the tenth day, unless the house of origin shall on that day be in adjournment. If on the tenth day the house of origin shall be in temporary adjournment in the course of a regular or special session, the bill shall become a law on the day on which the house of origin shall reconvene, unless the Governor shall on that day return the bill to that house.

---

[1] See *Senate Rule* 177 and *General Assembly Rule* 21:2.

These provisions evince a methodical pattern for the enactment of legislation by the Legislature, with the concurrence of the Governor or over his veto. It is clear that regardless of the identical or nonidentical content of bills introduced in either house that full accountability is both necessary and required. The mischief of undue haste was taken into account by the framers of our Constitution who expressly provided for dealing with urgent matters by Art. IV, § VI, par. 6, which authorizes "emergency" measures. It was for good reason that more than a simple majority has to approve a measure as an "emergency." The emergency vote by three-fourths of the members [2] is the safety valve provided consistent with reading every bill three times "in each house." Similarly, the rules of both houses of the Legislature provide detailed procedures for assuring that all bills are fully identified and moved through the Legislature in a manner that fully comports with the Constitution. See, *General Assembly Rule* 15:11a and *Senate Rule* 125 and the *Joint Rules of the Senate and General Assembly.*

In a commentary summarizing the principle changes brought about by New Jersey's Constitutional Convention, the Hon. Leon S. Milmed said:

Other major improvements in the Legislative Article include:

To "effectively cure the evil of rushing bills from second to third reading without giving the members of the Legislature an opportunity to study their contents", the Convention's Committee on the Legislative recommended, and the Convention adopted, a new provision (Article IV, Section IV, Paragraph 6) which has contributed immeasurably to the more orderly conduct of the legislative process. This provision prohibits any bill or joint resolution from being read a third time in either house until after the intervention of one full calendar day following the day of the second reading. The Committee on the Legislative recognized "that the inclusion of this provision might make it difficult, or even impossible, for the Legislature to deal with real emergencies, which might require immediate action". To guard against such a contingency the Committee proposed, and the Convention adopted an exception to the one day lay-over clause which permits a bill or joint resolution to proceed forthwith from second to third reading in either house if that house resolves by vote of three-fourths of

---

[2] There are 80 members of the General Assembly. Thus, 60 votes would be required to declare a bill an emergency measure in that house.

all its members, signified by yeas and nays entered on the journal, that it is an emergency measure.

In proposing the provision requiring a full day's intervention between second and third reading of a bill or joint resolution, the Convention's Committee on the Legislative expressed "confident expectation" that the provision "will not only bring about more orderly sessions of the Legislature but will also improve the character of legislation by affording an adequate opportunity to the members to become acquainted with bills which they know will be moved to third reading."

This provision, as well as the exception which permits its suspension on a three-fourths vote, has worked well. Their effective operation has greatly improved the orderly conduct of the work of the Legislature. [Milmed, "The New Jersey Constitution of 1947," *N.J.S.A., Const.,* at 91, 95–96 (1971)]

Senate Bill 711 was introduced in the State Senate on January 12, 1982, which was the first day of the 1982 session. On the same date Assembly Bill 605 (A–605) was introduced in the General Assembly. Both bills were advanced to second reading in their respective houses of the Legislature on that day. The Legislature then recessed until January 18 when the Senate reported S–711 out of committee and gave it the necessary third reading [3] in that house. The Senate proceeded to pass S–711 and delivered it that date to the General Assembly where it was given first reading upon receipt. S–711 was advanced to second reading on January 18 in the General Assembly by a vote of 41 in favor to 34 against. Although Assembly 605 had not been given a third reading in the General Assembly, by voice vote of that house on January 18, S–711 was substituted for A–605 by resolution pursuant to *Rule* 15:20 of the General Assembly. The resolution recited that the two bills were identical and that Assemblyman Baer (sponsor of A–605) was joined as a cosponsor of S–711. A vote was then taken to pass S–711 on third reading

---

[3]Preliminarily, it should be observed that a bill receives its first reading in the manner set forth in *Rule* 15:1f of the General Assembly which reads:

f. The reading by the Clerk of the number, title and committee reference if any, of each bill and resolution delivered to him by the Speaker shall be taken as the introduction and first reading of the bill or resolution.

A "reading" has been construed as the reading of a bill by its number, title, sponsor and committee reference. *See Anderson v. Camden,* 58 *N.J.L.* 515 (Sup.Ct.1896).

and it carried by a vote of 42 to 34, which is one more vote than required for passage.

The intent of this rule appears essentially directed at allowing a member or members of the other legislative house who have sponsored identical legislation to be listed as cosponsor on the bill ultimately passed and thus receive due credit as a sponsor of such legislation. Indeed, *Rule* 15:20 of the General Assembly relating to substitution expressly so provides: It reads:

> When a bill originating in the Senate shall have been delivered to this House, with a message that the Senate has passed the same and requesting the concurrence of this House therein, and a bill identical therewith, originating in this House, is then pending in this House, the Senate Bill may be substituted for such Assembly Bill, on motion of a sponsor of such Assembly Bill, upon or after the second reading of the Assembly Bill and the Senate Bill may then be advanced to, and have, third reading and be passed in substitution for the Assembly Bill and take the usual course of passed bills and the sponsors of the Assembly Bill may, upon the motion of one of them, be added as co-sponsors of the Senate Bill, with the Senator or Senators who were sponsors of the Senate Bill in the Senate and the names of such co-sponsors shall be endorsed upon the jacket containing the Senate Bill. The provisions of this Rule are expressly subject to the provisions of Rule 15:12. *No Senate bill may be substituted for an Assembly bill unless the Senate bill shall have received second reading in the General Assembly.* [Emphasis supplied]

The last sentence of this rule recognizes the necessity of a bill of the opposite house having received two readings before a substitute occurs. The substituted bill would thus be ready to be reported out on third reading after the intervening "full calendar day" or as an "emergency measure."

Notwithstanding the reasoning of the majority, I cannot agree that the simultaneous voting on identical but separate bills "in each house" of the Legislature, as opposed to the provisions of a bill which is itself read three times in each house, can be used to replace or substitute for the requirements of our State Constitution (absent, perhaps, a merger of two identical bills which have each fully passed their respective houses in accordance with constitutional requirements). It is certainly axiomatic, and I take it that it is a principle with which the majority does not disagree, that a rule of the General Assembly can neither eradicate a mandate of the Constitution nor contra-

vene or subvert the Constitution. However, this is exactly the effect of the majority's interpretation construing the Constitution here. Although *N.J.S.A.* 1:2–1 may not by its terms require a bill number, a sponsor or committee reference, a bill is constitutionally mandated to have a title which expresses and discloses its "one object," *N.J.Const.* (1947), Art. IV, § VII, par. 4. Hence, it is incomplete without the title as well as the "Be it enacted" clause required by *N.J.Const.* (1947), Art. IV, § VII, par. 6. See, also, *N.J.S.A.* 1:2–1. It could hardly be argued that sponsorship by a member of either house of the Legislature is not required for introduction of a bill even though such requirement only appears in the rules of the two houses of the Legislature and not in the Constitution. There must be a system of sponsorship and accountability for each bill. The Speaker of the General Assembly and the President of the Senate, respectively, must certify due passage of each bill in their respective houses. Absent compliance with all the constitutional requirements there cannot be a properly passed bill. The courts in their somewhat limited review of the legislative process may look behind even the certification of the Secretary of State to see if a bill has been passed in compliance with the Constitution and the Legislative Rules. *See In re Hague,* 104 *N.J.Eq.* 31 (Ch.1929), aff'd 104 *N.J.Eq.* 369 (E. & A. 1929).

Nor is it practical or possible to come within the ambit of fulfilling the Constitution when two independent bills are passed by separate houses, but neither one is passed by both houses. Common sense dictates such a requirement in a bicameral Legislature. The argument made in support of the validity of *L.* 1982, *c.* 1, might well lead to much mischief. Could an identical bill passed by each house then be signed by the Governor without the other house having specifically acted upon it? What would be the result here if instead of identical bills there were a few minor differences, but it could be argued that the bills were substantially the same? Nor could identical bills in the same house (aside from any prohibition by house rule which the majority stresses may be virtually ignored) which had each

been advanced to second reading by procedures not even requiring a vote, be sufficient to satisfy the constitutional requirement of a third reading in each house. See, *Joint Rule 5* of the Senate and General Assembly. Form certainly is not to be elevated over substance. However, we have a bicameral Legislature and the people of this State adopted the procedure for enacting statutes in our Constitution. Neither the Legislature nor the courts can ignore it or change it.

The Deputy Attorney General who argued the appeal contends that we should give more than passing deference to the *Rules of the General Assembly* on the theory that *Rule* 15:20 provides for a method of expediting legislation. In effect, this is a makeshift crutch to support what is, in my view, an erroneous proposition that this rule somehow allows a method of obviating the constitutional requirement that there be an intervening "full calendar day" following the second reading of a bill before it is eligible for final passage or that there be an emergency resolution adopted by a vote of three-fourths of the members of the appropriate house of the Legislature. See, *General Assembly Rule* 15:11a. What is important is the existence of a duly sponsored and adopted bill. For compliance with this constitutional requirement, the substance of the bill is irrelevant.

Reliance by the Deputy Attorney General on *Gilbert v. Gladden, supra,* 87 *N.J.* 275, appears inapposite. There, the issue involved was the "presentment" of bills to the Governor by the Legislature, and it was held that neither the Constitution nor *N.J.S.A.* 1:2–5 established a time limitation thereon. The Supreme Court found that this was an area solely within the control of the Legislative and Executive Branches of the government.

The rules of the General Assembly also provide that no bill shall pass that house without three readings. *Rules* 15:10 and 15:11 of the General Assembly speak in terms of "every bill" and "no bill," which clearly means each specific bill regardless of its

contents. Every bill must be treated independently. Those rules read:

> 15:10. Every bill and joint resolution, and every concurrent resolution proposing an amendment or amendments to the Constitution, shall be read three times in the General Assembly before final passage but no bill or joint resolution shall have a first and second reading on the same day without special order. A concurrent resolution, other than one proposing an amendment or amendments to the Constitution, shall be before the General Assembly and may be acted upon at any time after its introduction, unless it shall have been referred to committee. Any concurrent resolution, other than one proposing an amendment or amendments to the Constitution, which has been referred to committee, shall be before the General Assembly and may be acted upon at any time after the same shall have been reported by a committee.
>
> 15:11. a. No bill or joint resolution shall be considered on third reading in the General Assembly until after the intervention of one full calendar day following the day of the second reading but if the General Assembly shall resolve by vote of three-fourths of all of its members, signified by yeas and nays entered on the Minutes, that a bill or joint resolution is an emergency measure it may proceed forthwith from second to third reading.
>
> b. No bill, joint resolution or concurrent resolution shall be considered on third reading or for final action, as the case may be, in the General Assembly unless notice of the calendaring thereof shall have been distributed to the membership of the General Assembly by the Speaker at least six days prior to the day the bill or resolution is scheduled for such consideration; provided, however, that any bill, joint resolution or concurrent resolution may be considered on third reading or for final action, notwithstanding that the notice required herein has not been distributed to the membership, upon the adoption of a motion therefor. Any bills calendared for one session but not voted on, must be recalendared before consideration at any subsequent session.
>
> c. At any given meeting, the total number of bills, joint resolutions and concurrent resolutions which may be considered for final passage shall not exceed 30.

*Rule* 15:11a iterates the constitutional mandate of Art. IV, § IV par. 6, as to the requirements before a bill is eligible for third reading. It is abundantly clear that the General Assembly, in purporting to pass S–711 on "third reading" as a substitute for A–605, violated its own rules.[4] There was clearly no intervening day for S–711, the bill attempted to be substituted for A–605. In effect, S–711 would have been placed on second

---

[4]There is no record of any vote to suspend the *General Assembly Rules.* See *Rule* 21:2.

reading in the General Assembly. Nor had there been any calendaring notice for A–605. If A–605 had been considered an Assembly Committee Substitute (which it was not), it would still have been necessary to have an intervening calendar day or an emergency vote before it could be given third reading and placed in a position for a vote. Indeed, under *In re Ross,* 86 *N.J.L.* 387 (Sup.Ct.1914), a question might well arise as to whether it would have to go back to the Senate to receive three readings for passage notwithstanding the language of the two bills was identical. If a Governor chose to veto such a bill or committee substitute, he would have to return it to the "house of origin," and that might not always be determined with certainty. Furthermore, "substituting" S–711 for A–605 confers no special status on either S–711 or A–605. The effect is that A–605 is no longer viable and its then position in the General Assembly legislative process becomes immaterial and irrelevant. S–711 likewise receives no enhanced status. It is merely the bill that the General Assembly elects to consider in place of A–605. S–711 must then be considered in whatever posture it existed. The same would apply if a committee substitute were voted out of committee. *See In re Ross, supra.* There is no metamorphosis of S–711 by the resolution to substitute it for A–605. Such action in no way advances or changes the status of S–711 except that the sponsors of A–605 may be listed as co-sponsors of S–711.

Neither is *U. S. Gypsum Co. v. Michigan Dep't of Revenue,* 110 *N.W.2d* 698 (Mich.1961), persuasive in support of a validation of this legislation. In that case the Michigan Supreme Court, two justices dissenting, upheld the constitutionality of a bill on a challenge that it had not been read three times prior to passage in compliance with a provision in Michigan's Constitution of 1908. However, relying on Michigan precedents, the court narrowed the issue to the sole question of whether the "new" version which had passed in the house without any

reading was so completely different from the original version as to constitute a "new bill" rather than an amended version.  *Id.* at 701.  The court then found that the substituted version was "germane" to the original bill in that its major purposes were all within the original objectives of the bill as first introduced.  *Id.* at 702–703.  It is clear that *U. S. Gypsum Co.* was grounded on the court's finding that the original bill was read at least twice in compliance with that state's constitution before the substituted version was passed.  In the instant case passage of the Senate bill did not comport with our constitutional requirement that one full day intervene between the second and third readings.

There are potential time problems and scheduling difficulties because of the Congressional elections which have arisen because of delay in legislative action.  Both S–711 and A–605 relate to the redistricting process and set up 14 legislative districts to be voted upon in the November 1982 elections.  Nonetheless, the Constitution must be upheld not only by the Governor and the judges, but all constitutional officers, including each member of the Legislature, all of whom take a pledge to do so in their oath of office.  The Legislature and the Governor can in a constitutionally proper manner either enact the same or similar or different legislation to accomplish the required purpose of establishing proper legislative districts and can also provide for the mechanism for a timely election.[5]

I would declare chapter 1 of the *Laws of* 1982 invalid under *N.J.S.A.* 1:7–1 *et seq.*  As a result, I would enjoin the Secretary of State from conducting primary or general elections for the office of Member of Congress based on the Congressional districts purported to be enacted by *L.* 1982, *c.* 1.

---

[5]Many states have their primary elections in September and there has been debate in the past, and will be in the future, about the wisdom of shortening the time between the primary and the general elections.