APPLICATION OF EDWIN B. FORSYTHE, MATTHEW J. RINAL-
DO, MILLICENT FENWICK, HAROLD C. HOLLENBACK,
JAMES A. COURTER, MARGARET S. ROUKEMA, AND CHRIS-
TOPHER H. SMITH.

Argued May 11, 1982—Decided May 21, 1982.

*Jonathan L. Goldstein* argued the cause for appellants (*Hellring, Lindeman, Goldstein & Siegal,* attorneys; *Jonathan L. Goldstein, Bernard Hellring, Robert S. Raymar* and *Stephen L. Dreyfuss,* on the brief).

*William Harla,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* Assistant Attorney General, of counsel).

*Lawrence T. Marinari* argued the cause for intervenors Alan J. Karcher, Speaker of the New Jersey General Assembly and the New Jersey General Assembly and Carmen A. Orechio, President of the New Jersey Senate and the New Jersey Senate

(*Marinari & Farkas* and *Greenstone & Sokol,* attorneys; *Lawrence T. Marinari, Leon J. Sokol* and *Robert A. Farkas,* of counsel and on the brief).

PER CURIAM.

This case presents an attack upon the validity of Chapter 1 of the Laws of 1982, which delineates districts throughout the State for the election of members to the House of Representatives of the United States Congress. Passage of the legislation became necessary following the release of the results of the 1980 decennial census and notification to the Governor that the total number of members in the House of Representatives to which the State of New Jersey was entitled had been reduced from 15 to 14. See 2 *U.S.C.A.* § 2a(b). The challenge to the congressional redistricting enactment was brought on the petition of several current members of the House of Representatives as citizens of the State under *N.J.S.A.* 1:7–4. The constitutional question raised by their petition is narrow. They contend that *L.* 1982, *c.* 1 was not enacted in conformity with the requirements for the passage of legislation prescribed by Article IV, § 4, ¶ 6 of the New Jersey Constitution (1947).[1]

The Appellate Division sustained the validity of the statute. There was, however, a dissent, entitling petitioners to appeal to this Court as a matter of right pursuant to *R.* 2:2–1. Upon receipt of the notice of appeal, we accelerated consideration of

---

[1] Prior to instituting this litigation, the petitioners brought a constitutional challenge to S–711 in federal court. Their claim in that action specifically addressed the merits of the enactment; they argued that the proposed redistricting scheme had the effect of diluting the exercise of the fundamental right to vote that is guaranteed by the Constitution of the United States. *Daggett v. Kimmelman, et al.* 535 *F.Supp.* 978 (D.N.J.,); *Forsythe, et al. v. Kean, et al.* 535 *F.Supp.* 978 (D.N.J.,). The three-judge court (one judge dissenting) held the statute to be unconstitutional. However, the United States Supreme Court stayed the judgment of the lower court and permitted the June 8, 1982 Congressional primary to be conducted in accordance with the scheme contained in S–711. *Karcher, et al. v. Daggett, et al.,* —— *U.S.* ——, 102 S.Ct. 1298, 71 *L.Ed.*2d 635 (U.S.Sup.Ct.).

the matter. The initial adversary parties in the case were the petitioners and the Attorney General. In addition, the Court granted the applications of the Speaker of the General Assembly and the General Assembly, and the President of the Senate and the Senate to intervene as parties-respondent, all of whom, with the Attorney General, defend the validity of the enactment.

We have concluded that the passage of L. 1982, c. 1 was not violative of the requirements prescribed by Art. IV, § 4, ¶ 6 of the New Jersey Constitution (1947). Accordingly, the validity of the statute on this ground is sustained. We reach this determination substantially for the reasons found persuasive by the majority of the court below and, therefore, affirm the judgment of the Appellate Division, 185 N.J.Super. 582.

The facts of this case are undisputed. On January 12, 1982, S–711 was introduced in the New Jersey Senate and given its first reading. It was advanced to second reading on that date and six days later, on January 18, 1982, it was given its third reading, passed by the Senate by a vote of 21 to 18, and then delivered to the General Assembly.

Contemporaneously with this action in the Senate regarding S–711, the General Assembly had before it an identical congressional redistricting bill, A–605. The substantive contents of both S–711 and A–605 were absolutely identical; the only divergence between the two consisted of their respective assigned numbers, the names of their sponsors and the color of their paper backers.[2]

A–605 was also introduced on January 12, 1982, and given its first and second readings on that date. On January 14, 1982, official notice was given in the Legislative Digest that A–605 was placed on the General Assembly's Board List for consideration at its January 18, 1982 session. On January 18, 1982, six

---

[2]The Legislature has established a system of color-coding the backers on bills that, along with the numbering scheme and sponsorship statement, designates their origin.

days after A–605 had been given its second reading, S–711 was received from the Senate with its accompanying request of the Assembly's concurrence therein. The General Assembly determined to substitute S–711 for A–605. It gave S–711 its first reading and, on the same date, pursuant to a special motion, it was given its second reading. Thereafter, also on January 18, 1982, the Assembly adopted, by voice vote, a motion to substitute S–711 for A–605. This was done pursuant to Rule 15:20 of the Rules of the General Assembly, which provides:

> When a bill originating in the Senate shall have been delivered to this House, with a message that the Senate has passed the same and requesting the concurrence of this House therein, and a bill identical therewith, originating in this House, is then pending in this House, the Senate Bill may be substituted for such Assembly Bill, on motion of a sponsor of such Assembly Bill, upon or after the second reading of the Assembly Bill and the Senate Bill may then be advanced to, and have, third reading and be passed in substitution for the Assembly Bill and take the usual course of passed bills and the sponsors of the Assembly Bill may, upon the motion of one of them, be added as co-sponsors of the Senate Bill, with the Senator or Senators who were sponsors of the Senate Bill in the Senate and the names of such co-sponsors shall be endorsed upon the jacket containing the Senate Bill. The provisions of this Rule are expressly subject to the provisions of Rule 15:12. No Senate bill may be substituted for an Assembly bill unless the Senate bill shall have received second reading in the General Assembly.

After substitution, S–711 was immediately given a third reading in the Assembly, and it was passed on January 18, 1982 by a vote of 42 to 34. The bill was thereafter delivered to Governor Byrne and signed into law on January 19, 1982, the Governor's last day in office.

The constitutional provision assertedly violated by the passage of this legislation, *N.J.Const.* (1947), Art. IV, § 4, ¶ 6, provides in pertinent part that:

> All bills and joint resolutions shall be read three times in each house before final passage. No bill or joint resolution shall be read a third time in either house until after the intervention of one full calendar day following the second reading.

The majority opinion in the Appellate Division observed that the constitutional provision for the intervention of one full calendar day was adopted by the framers to insure that legislation would be read and studied by legislators before its ultimate passage;

to satisfy the constitutional provision, then, a bill must only remain "unchanged" before a house of the Legislature for at least one calendar day between its second and third readings. 185 *N.J.Super.* at 588. The majority ruled further that the Constitution does not rigidly require that any particular rite be followed in the passage of legislation. *Id.*

Having reached these conclusions, it went on to consider broadly what constitutes an "unchanged" bill and, more specifically, whether, in this case, those aspects in which S–711 differed from A–605 were sufficient to disturb the requisite identity between the two in a manner that would undermine the constitutional mandate.

The majority reasoned that "a bill in the legislative sense consists of its content—the words which are to be adopted by the Legislature that ultimately will become law." Conversely, the number at the top and the name of the sponsor were regarded as "mere accidents—mere tangible effects adopted for the purpose of easy identification." 185 *N.J.Super.* at 588. We are in accord with this understanding of the meaning to be imputed to the term "bill" as used in Art. IV, § 4, ¶ 6 of the Constitution. The content of the bill and its written expression constitute the essence of legislation.

In legislative parlance, the term "bill" is the denomination or label given to legislation before its enactment into law. *Hubbard v. Lowe,* 226 *F.* 135, 137 (S.D.N.Y.1915), appeal dismissed 242 *U.S.* 654, 37 *S.Ct.* 12, 61 *L.Ed.* 547 (1916); *Black's Law Dictionary* 209 (Revised 4th ed. 1968); *cf. People v. Brady,* 262 *Ill.* 578, 588, 105 *N.E.* 1, 5 (1914) (amendments to a bill during the passage of legislation, being incorporated as part of the "text," are properly understood to be included in the word "bill"). The Constitution requires that such a legislative proposal must be read at least three times in each house of the Legislature, with an interval of at least one day between the second and final readings, before the proposal becomes eligible for final enactment through the action of the Governor. The

legislative expression constituting the proposal or bill must be the same that is duly passed in each legislative house. The identity or legal equivalency between the final enactment and the proposed enactment, when a statute is in "bill form," can be determined solely by a comparison of their content.

The dissent below disagreed with this position, regarding the absolute identity between the content of the two bills as insufficient to satisfy the constitutional mandate. Thus, in its view, the fact that A–711 had a different number, sponsor and color-coded backer rendered it different from A–605. Consequently, the resolution to substitute the former for the latter did not effect "any metamorphosis of A–711 into A–605;" and since the bill numbered A–605 was not separately read before the Assembly on January 18, and the bill numbered A–711 that was read for the third time on that day had not been given a second reading more than one full calendar day prior to January 18, the constitutional mandate of one full calendar day had not been met. 185 *N.J.Super.* at 598.

As pointed out by the majority, the dissent accords inappropriate significance to the physical indicia of the source of legislative bills. The features which serve to facilitate the observable identity of particular legislative proposals or bills are designed to assure proper and meticulous housekeeping. They are necessary to ensure the security of proposed legislation. By clearly demarking and identifying each bill, these procedures serve to avoid mistakes, errors, confusion, deception or fraud in the handling and passage of legislation. In this sense they serve to preserve and foster the integrity of the legislative process. But surely these necessary techniques are no more than the hallmarks of efficient business management—extraordinarily important when the business involved is that of the people conducted by their representatives in the halls of the Legislature. The recordkeeping procedures of the Legislature do not, however, serve to define or delimit the constitutional understanding of the meaning of the term "bill." We are confident that the constitutional founders believed that the essence of legislation is

the expression of its contents and intended that legislation—both in its status as enacted law and as a preenacted bill or proposal—is to be identified by its content.

■ In reaching this conclusion, we are guided by the purpose and intent of the Constitution. See *Student Public Int. Research Group v. Byrne,* 86 *N.J.* 592, 596–601 (1981); *Vreeland v. Byrne,* 72 *N.J.* 292, 306–07 (1977); *Myers v. United States,* 272 *U.S.* 52, 47 *S.Ct.* 21, 71 *L.Ed.* 160 (1927). Courts are admonished to find and to heed the intent of legislators, constitutional as well as statutory. An inquiry into the intent of the framers, as illuminated by historical commentary, is particularly relevant. 2A *Sutherland Statutory Construction* 233 (4 ed. 1973); *Whateley v. Leonia Board of Education,* 141 *N.J.Super.* 476, 479 (Ch.Div.1976); *State v. Wrightson,* 56 *N.J.L.* 126, 193–99 (Sup. Ct.1893).

All parties recognize the aptness of Judge Milmed's comments on the New Jersey Constitution of 1947, that the primary purpose underlying the constitutional provision for the intervening calendar day between the second and third readings was to afford an adequate opportunity to the members of the Legislature and of the public to become acquainted with and study bills that eventually might be enacted into law. See L. Milmed, "The New Jersey Constitution of 1947," *N.J.S.A.* Const. Vol. 1, p. 91, 95–96 (1971). Abundant discussion during the Constitutional Convention also supports this proposition.[3]

---

[3]For example, on July 7, 1947, Spencer Miller, Jr. introduced a resolution proposing the constitutional text for Article IV, § 4, ¶ 6. This original Proposal No. 31 did not contain the language pertaining to the intervening calendar day. It provided:

No bill or joint resolution shall be considered on third reading in either House until it shall have been printed and upon the desks of the members of the House, in its final form, at least three calendar legislative days; unless the Governor shall have certified that an emergency exists requiring its immediate consideration on third reading by a two-thirds vote of all the members. [II *Proceedings of the New Jersey Constitutional Convention of 1947,* 1014 (1951) (hereinafter "*Proceedings*")]

Counterbalanced against this concern for undue haste in the passage of legislation, there was also an awareness that specifying in great detail the procedures to be followed in legislating could well have untoward results. Thus, there was a recognition that while procedural requirements, such as the three-reading rule, would have on the whole a beneficial effect upon legislative practices and the legislative product, they can also lead to nullification of legislation and produce "doubt, litigation, and undesirable cumbrousness to avoid doubt and litigation." T. Sinclair, "Procedural Limitations on the Legislative Process in the New Jersey Constitution," (Monograph), in II *Proceedings* 1501, 1523; see generally *id.* at 1516–18, 1521–27. The debate among the representatives to the Constitutional Convention upon the proposals for the passage of legislation evinces a purpose to eliminate or reduce procedural limitations that are productive of "a lot of perfectly unnecessary and worthless litigation." III *Proceedings* 575.

█ There was also some recognition among the constitutional delegates that the essence of a bill relates to its contents so that there will be complete substantive exactness between the proposal that is read three times in each legislative house and the passed bill that ultimately becomes law. *Id.* at 585–87. The constitutional mandate in Art. IV, § 4, par. 6, that there be one full calendar day between the second and third readings of a bill, is fully satisfied where the substantive contents of the bill remain unchanged in any manner and are before each house for the requisite period of time. Given that the purpose of the provision was to ensure that legislators be provided the opportunity to become familiar with the contents of a law as it was ultimately enacted, one may readily find compliance with the

---

The provision for one full intervening calendar day was added as a result of extensive debate regarding what was denominated as "legislative lightning"—this meaning the practice of rushing bills through to passage without adequate opportunity for members of the public and, more importantly, members of the Legislature to read and study them. I *Proceedings* 141.

constitutional provision in this case. To the extent the constitutional requirements of Art. IV, § 4, ¶ 6 call for literal compliance, that mandate was met. See *Vreeland, 72 N.J.* at 305. This conclusion follows from the fact that the legislators of each house had before them the identical substantive contents of the bill that became *L.* 1982, *c.* 1 for more than the prescribed duration and intervals of time. As noted, A–605 and A–711 were absolutely equivalent to one another in terms of substantive content. There was, in constitutional effect, one bill that was properly acted upon by each legislative house. The procedure followed to substitute A–711 for A–605 was simply a device to place before the Governor for his final action a single, passed bill. In this case that bill validly emerged from each house of the Legislature according to the prescribed constitutional path and was duly enacted into law.

The dissent below believed that its more exacting definition of what constitutes a "bill" for the purposes of enactment under Art. IV, § 4, ¶ 6 fulfilled more completely the constitutional purpose of that provision than the majority's view. The effectuation of the goals of an enactment is not always served by overachievement. The focus by the dissent upon the methods for bill substitution and the implementation of the mechanics for bill passage, relating to such things as bill numbering, color coding, sponsorship and the like, pertain to bill identification and recordkeeping. These matters go beyond the constitutional scheme, and while they are consistent with the constitutional plan, they are not its equivalent.

All of the judges of the Appellate Division recognized that the motives, obvious or imputed, of the successful proponents of the congressional redistricting law, are not germane to the constitutional issue before us. We need not characterize such motives in determining the validity of the passage of the statute. Whether the legislation is beneficient is not relevant in terms of whether it was enacted in accordance with the procedures laid down by our Constitution. The Attorney General and

intervenors have referred to many different kinds of statutes which have been enacted in the same form and by the same route as *L.* 1982, *c.* 1. We gain no special insight from this practice nor do we ascribe any particular weight to it in reaching our conclusion. As recognized by the petitioners, in deciding the validity of the procedures followed in the passage of legislation, it is pointless to engage in an inquiry as to whether in some other constitutional, governmental or policy senses such legislation is actuated by good or bad motives.

For these reasons and those generally expressed by the majority of the Appellate Division, we affirm the judgment below.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.